696 So.2d 652 (1997)
Barry LUGAR
v.
BATON ROUGE GENERAL MEDICAL CENTER.
No. 96 CA 1873.
Court of Appeal of Louisiana, First Circuit.
June 20, 1997.
*653 Hany A. Zohdy, Baton Rouge, for Plaintiff/Appellant Barry Lugar.
Myron A. Walker, Jr., Baton Rouge, for Defendant/Appellee Baton Rouge General Medical Center.
Before GONZALES and KUHN, JJ., and CHIASSON[1], J. Pro Tem.
KUHN, Judge.
This suit involves a claim for damages allegedly caused by the unauthorized release of confidential medical information. On appeal, plaintiff-appellant, Barry F. Lugar, challenges the trial court's action of granting a directed verdict in favor of defendant-appellee, Baton Rouge General Medical Center ("Baton Rouge General"). We affirm.

I. FACTS AND PROCEDURAL BACKGROUND
During 1988, after having pled guilty to more than one charge of driving while intoxicated, Lugar sought an alcohol abuse assessment at the Baton Rouge General Medical Center Chemical Dependency Unit. Lugar was advised he needed out-patient treatment. He returned for treatment, but did not complete the program. Lugar later attended another out-patient program in a different city.
On February 28, 1990, Lugar, who had worked in the insurance industry for many years, applied for life insurance coverage through Indianapolis Life Insurance Company ("Indianapolis Life"). Around that same time, Lugar began working as an agent for Indianapolis Life. Pursuant to the application process, Lugar executed an "Authorization to Obtain and Disclose Information." This blanket authorization form provided, in pertinent part, as follows:
I authorize Indianapolis Life ... to obtain medical and other information on me.... This includes information about drugs and alcohol and about diagnosis, treatment and prognosis of any physical or mental condition, as well as any other non-medical information.
This information can be released by ... any hospital, clinic or other medical or medically related facility.... Information can also be released by ... the Medical Information Bureau (MIB)....
I acknowledge that the information obtained by this authorization will be used by Indianapolis Life to determine eligibility for insurance applied for....
In Part II of the application, entitled "Declarations Made to Medical Examiner," Lugar *654 checked the box in the column under "No" for question 5.c., which stated, "Have you ever [s]ought or received advice for or treatment of or been arrested for use of alcoholic beverages?"
According to Lugar's testimony, he also signed a form dated April 2, 1990, which was entitled, "Authorization for Release of Confidential Information." Pursuant to the form, Lugar authorized Baton Rouge General to release information for his application for insurance to Indianapolis Life. "X's" were used to designate categories of information which were subject to release. An "x" was marked authorizing the release of information regarding "History and Physical examination reports" and "Laboratory and X-ray reports."
Pursuant to the application review process, Indianapolis Life's senior underwriter, Sue Calvin, initially obtained information regarding Lugar from the Medical Information Bureau (the "MIB"), a central registry for medical information utilized by insurance companies. Some of the codes that Calvin obtained from the MIB led her to believe there was undisclosed information on Lugar's application and the medical examination record. These codes pertained to treatment for alcoholism and for the treatment of a psychoneurotic disorder.
This information prompted Calvin to seek additional information to process Lugar's application. Calvin requested medical records from Lugar's attending physician, Dr. John Palermo. She discovered that as of January 1990, Lugar had been seeing a psychologist for fourteen months and was being treated with several medications for depression. She explained this information alone would have caused the company to assess an extra premium for insurance coverage.
Based on information provided by Lugar during his physical examination (and included in Part II of the application, "Declarations Made to Medical Examiner"), Calvin knew Lugar had been treated by the Baton Rouge General. Calvin originally requested medical records from Baton Rouge General on March 16, 1990. By letter dated March 23, 1990, Baton Rouge General responded to the February 28, 1990 blanket form authorization stating, "The authorization mailed to us is inadequate due to Federal Confidentiality Regulations...." The hospital sent its own authorization form, which Calvin forwarded to Allen Waldrop, the Indianapolis Life agent handling Lugar's application. Along with the form, Calvin sent a letter requesting that Waldrop have Lugar sign and date the form so that Indianapolis Life would be able to obtain the medical records.
Dovie Brady, the director of the Medical Records Department at the Baton Rouge General, identified a letter sent by the department to Indianapolis Life, dated April 17, 1990, which stated that the hospital was "unable to fulfill your request for information regarding the above named patient at this time ..." because "History and Physical and Lab reports were not included in patient chart." This letter was sent in response to an April 2, 1990 authorization executed by Lugar which authorized only the release of "History and Physical examination reports" and "Laboratory and X-ray reports." Brady testified that the department also received another authorization form, which was signed by Lugar and dated April 2, 1990. Pursuant to this form, Baton Rouge General was authorized to release certain information for application for insurance to Indianapolis Life. Again "x's" were used to designate which categories of information were subject to release. On this particular form, an "x" appeared next to "Diagnoses, including those relating to alcohol or drug abuse, if any," "History and Physical examination reports," "Consultations," "Laboratory and X-ray reports," "Physician's progress notes," and "Discharge Summary." Based on this form, the Medical Records Department copied Lugar's medical records and sent them to Indianapolis Life on May 8, 1990.
Upon examining the medical records, Calvin learned Lugar had presented himself for treatment at the Baton Rouge General in 1988, admitting to a long history of alcohol abuse and dependence. Upon reviewing the medical information received from all sources, Calvin determined that some of the information she received conflicted with the information Lugar provided in his application for insurance. A determination was made *655 not to issue a policy to Lugar. The decision was based on Lugar's previous treatment for alcohol use and depression and his continuing use of alcohol. Calvin testified that her decision to decline coverage was not based solely on information received from Baton Rouge General. Calvin also testified she had no reason to believe the information gathered by the underwriting department pertaining to Lugar was made available to other departments of Indianapolis Life.
Lugar testified his employment with Indianapolis Life was terminated during June or July of 1990, and that he has been unsuccessful in obtaining employment in the insurance industry since that time. Although he has maintained other employment, his annual salary has been substantially less than the salary he earned while working in the insurance industry.
Lugar's wife, Patricia Lugar, testified that her husband had taken a trip to Indianapolis and when he returned he informed her he had been fired. She also acknowledged that while on that same trip, Lugar had been arrested for disturbing the peace, but stated that nothing ever came of the arrest.
Lugar filed this suit against Baton Rouge General asserting the hospital "acted beyond the scope of the authorization for release of confidential information and released information covering diagnosis related to [his] past alcohol abuse and treatment." Lugar further asserted that because this information was released, he was denied insurance coverage and his employment was terminated. In his petition, Lugar seeks recovery of damages for mental pain and suffering, humiliation and embarrassment; past, present, and future lost wages; and past, present, and future financial burden due to inability to obtain health insurance. Lugar contends the sole and proximate cause of these damages is the negligence of the hospital and its employees in failing to respect and protect confidential information.
During the trial, defendant filed a motion for a directed verdict, which the trial court granted. A judgment was signed in favor of defendant dismissing plaintiff's demands. Lugar appeals, urging the trial court abused its discretion in granting defendant's motion for directed verdict.

II. ANALYSIS
La. C.C.P. art. 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
In Busby v. St. Paul Ins. Co., 95-2128, pp. 16-17 (La.App. 1st Cir. 5/10/96); 673 So.2d 320, 331, writ denied, 96-1519 (La.9/20/96); 679 So.2d 443, this court addressed the standard of review for directed verdicts, as follows:
A trial court has much discretion in determining whether or not to grant a motion for directed verdict. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law *656 underpinning the plaintiff's claims. (Citations omitted.)
In an action to recover damages allegedly caused by another's negligence, a plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989) (on rehearing). The standard negligence analysis employed in determining whether to impose liability under La. C.C. art. 2315 is the duty-risk analysis. Roberts v. Benoit, 605 So.2d 1032, 1041 (La. 1991). For liability to attach, plaintiff must establish that 1) the conduct in question was a cause in fact of the resultant harm; 2) the defendant owed a duty to plaintiff; 3) the duty owed was breached; and 4) the risk or harm caused was within the scope of the breached duty. Fox v. Board of Supervisors, 576 So.2d 978, 981 (La.1991).
Plaintiff asserts he has established these four criteria. Plaintiff contends the release of information pertaining to his treatment for alcohol abuse was unauthorized and that the defendant "by unjustifiably and impermissibly releasing confidential medical information of a [persumptively] (sic) scandalous nature caused that information to be available to any insurance company with access to the [MIB]." Although Lugar admitted at trial that his signature appears on the release form which authorized Baton Rouge General to release information relating to alcohol or drug abuse, he denies having signed the release. He asserts the evidence establishes there was some tampering with the authorization form, having testified that he never would have signed the broad release because he believed he was entitled to maintain the confidentiality of those records. During the trial, Lugar testified that upon his examination of the broad authorization form, he observed that the "x's" appearing in the boxes pertaining to "Diagnoses, ... relating to alcohol or drug abuse," "Consultations," and "Discharge summary" were smaller than the other "x's" on the form and were aligned differently than the other "x's."
We find the trial court did not abuse its discretion in granting the directed verdict in favor of Baton Rouge General. The evidence presented during the trial of this matter establishes that Baton Rouge General released the information pertaining to Lugar's alcohol abuse based on a form which indicated that such release was authorized by Lugar, i.e., the broad form release authorizing release of information pertaining to "Diagnoses, including those relating to alcohol or drug abuse, if any." The release of information by the hospital was not beyond the scope of this authorization for release. Lugar acknowledged that the signature that appeared on the form was his signature. While an inference can be drawn that someone may have tampered with the form, there is no evidence upon which reasonable men could base a conclusion that Baton Rouge General (or its employees) had tampered with the form.
We find no authority to support the proposition that Baton Rouge General had a duty to ascertain whether the authorization form had been altered after its execution by Lugar. The evidence does not establish any facts to support a finding that Baton Rouge General should have suspected the form was not valid.[2] Considering all of the evidence and all evidentiary inferences in the light most favorable to Lugar, we conclude the *657 facts and inferences are so overwhelmingly in favor of Baton Rouge General that reasonable people could not have reached a contrary verdict.

III. CONCLUSION
For the above reasons, we find the trial court did not abuse its discretion in granting a directed verdict in favor of Baton Rouge General. The judgment of the trial court granting defendant's motion for directed verdict and dismissing plaintiff's demands with prejudice is affirmed. Costs of this appeal are to be paid by plaintiff-appellant, Barry F. Lugar.
AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Lugar asserts that the medical release form used by Baton Rouge General fails to comport with the minimum requirements of 42 U.S.C. § 290dd-2 pertaining to confidentiality of records, and that this noncompliance should be considered negligence. We find no merit in this argument because we conclude the form used by Baton Rouge General does comply with the federal statute and prescribed regulations for the enforcement of this statute. 42 C.F.R § 2.31. Moreover, even if the form did not comply with this federal legislation, we do not agree that the non-compliance necessarily would establish a negligence claim under Louisiana law. The standard duty-risk negligence analysis is the appropriate analysis to be applied. We further note that the purpose of the federal legislation was not to create a private right of action for violations of the confidentiality provision. Rather, by enforcing the statute through the imposition of criminal penalties, Congress intended to create public penalties in order to deter disclosure. The statute merely emphasizes the importance of preserving the confidentiality of patient records in order to encourage individuals to seek treatment. See Ellison v. Cocke County, 63 F.3d 467, 470-471 (6th Cir. 1995).